UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

David A. LeFebvre,           :
            Plaintiff,       :
                             :
      v.                     :    File No. 1:05-CV-255
                             :
Michael J. Astrue, as        :
Commissioner of Social       :
Security Administration,     :
            Defendant.       :

OPINION AND ORDER
(Papers 116 and 133)

Plaintiff David A. LeFebvre, proceeding *pro se*, brings

this action claiming that while he was employed by the Social

Security Administration ("SSA"), he was discriminated against

on the basis of his disabilities.  Defendant Michael J.

Astrue, Commissioner of the SSA ("defendant" or

"Commissioner"), has moved for summary judgment arguing that

LeFebvre has not set forth facts sufficient to support a claim

of disability discrimination.  For the reasons set forth

below, the defendant's motion is GRANTED and this case is

DISMISSED.

Factual Background

On July 6, 1999, LeFebvre was hired by the SSA as a

Claims Representative.  He had previously worked as an

educator and school administrator, including a period as a

school principal.  His hiring was part of a federal Selective

Placement Program ("SPP"), which involved the recruitment and

placement of disabled individuals in federal jobs.  LeFebvre qualified for this program because he has epilepsy.

Notwithstanding their disabilities, candidates for the SPP were required to meet the minimum qualifications for each position as determined by the federal government's Office of Personnel Management.  When certifying a candidate, a specialist from either the State Vocational Rehabilitation agency or the Veteran's Administration ("VA") would first evaluate the specific job duties, the job site, and the nature of the candidate's disabilities.  Once a candidate was certified by the State or the VA, the certification was reviewed by the Center for Human Resources.

In this case, Jody Casey of the Vermont Division of Vocational Rehabilitation certified LeFebvre to the SSA.  In her May 20, 1999 certification letter, Casey stated that LeFebvre had not had a grand mal seizure in years and that his petit mal seizures were generally restricted to waking moments at home.  The letter also confirmed that LeFebvre had the ability to perform the duties of a Claims Representative at the SSA with no major accommodations.  At the time of Casey's letter, and based upon his understanding of the job and its training components, LeFebvre agreed with her assessment. (LeFebvre Dep. at 132, Paper 117-4 at 6).

LeFebvre asserts that, because of his epilepsy and as a side effect of his medications, his disability includes learning issues.  On May 4, 1999, shortly before his hiring by the SSA, he was given a neuropsychological evaluation at Dartmouth-Hitchcock Medical Center.  The evaluation concluded, among other things, that his cognitive functions were "in the context of average intellectual ability.  In contrast to self-reported memory and word retrieval problems, Mr. Lefebvre demonstrated average to high average memory and expressive language abilities on standardized tests."  The evaluation also revealed a difference between verbal and non-verbal intellectual ability, with the verbal in the average range and the non-verbal in the "high average" range.  The report concluded "that in the context of a quiet structured environment similar to the testing setting [LeFebvre] can function within normal limits."  (Paper 121-7 at 8-9).

When LeFebvre's treating physician, Dr. Primeau, received the report, he wrote a note on the top stating "no cognitive defects."  On June 3, 1999, Dr. Primeau wrote to the SSA office in Burlington and explained that LeFebvre "has medical problems for which he is being treated, including epilepsy, hypertension, obstructive sleep apnea, and probable angina. He has also recently had mild depression."  (Paper 117-3 at 7).  On June 10, 1999, Cathy Allen at the Center for Human

3

Resources reviewed LeFebvre's qualifications and determined
that he met the minimum qualifications for the Claims
Representative position.

The job of Claims Representative involves explaining SSA
programs to members of the public and eliciting the
information needed to process claims.  According to a printed
job description offered by the defendant, the position also
involves assessing "the logic and completeness of the
information received," identifying "the types of evidence and
documentation needed to resolve the issues encountered," and
performing "adjudicative and/or authorization functions
subject to the review procedures imposed."  (Paper 117, Ex. 9
at Bates # 10453).  The defendant further highlights the
portion of the job description that requires an understanding
of "the philosophy, principles, objectives, and specific
provisions of the programs administered," familiarity with
relevant state laws, and a general understanding of "legal and
general business procedures which affect program policies and
case decisions."  Id. at Bates # 10454.[1]

LeFebvre's employment began on July 6, 1999.  For
training, he was assigned to attend the Interactive Video

---

[1]    LeFebvre does not recall receiving any such job
description, and thus "can neither verify nor contradict that
this was the job description for Claims Representative back in
1999-2000."  (Paper 120 at 13).

Training ("IVT") program.  IVT involved live, on-air instruction delivered to each training site.  As the name suggests, the training sites were able to interact with the program's instructors.  LeFebvre's training program consisted of four hours of IVT training, and four hours of "off air" activities each day.  (Paper 117-19 at 6).

One of LeFebvre's primary claims is that the IVT program was inadequate, and that he should have been offered live instruction.  According to Susan Gingrich, District Manager of the Burlington SSA office, the IVT program was "the national training procedure for new Social Security Claims Representatives."  (Paper 117-7 at 6).  LeFebvre contests this characterization, and has submitted a document allegedly showing that the IVT program had not yet been fully implemented nationwide by the end of 1999.  While the document states that "only about 50 percent of Agency field offices were equipped with IVT infrastructure," it also states that in Fiscal Year 1999, over 119,000 people received training via IVT.  (Paper 121-10 at 6).

LeFebvre was the only person in the Burlington office attending the IVT program at that time.  It is undisputed that LeFebvre attended the program solo because he was the only new Claims Representative hired in the Burlington office during that time period.  (LeFebvre Dep. at 152, Paper 117-4 at 15).

In addition to IVT instruction, LeFebvre was provided on-the-job training and assistance by an assigned mentor. His mentor was Sidney Harmon, a Claims Representative with 25 years of experience. LeFebvre notes that while Harmon himself was experienced, the IVT program itself was relatively new and was being used for the first time in Vermont. LeFebvre also alleges that Harmon's instruction at times conflicted with the instruction provided in the IVT.

LeFebvre suffered two petit mal seizures during IVT presentations. Following the first seizure, he asked the IVT instructors to summarize the material from the previous week. The instructors declined, citing time constraints. LeFebvre did not inform the instructors that his request was based upon the fact that he had missed some of the presentation due to a seizure.

After his IVT training began, LeFebvre asked Gingrich to allow him to attend live classroom training. As he explained in his deposition, he felt that he "wasn't learning as much as I should have been learning," and that inconsistencies between the IVT training and his mentoring were hindering his progress. (LeFebvre Dep. at 142-43, Paper 117-4 at 7-8). He does not recall whether, when he asked for classroom training,

he linked his request to his epilepsy.  (LeFebvre Dep. at 153, Paper 117-4 at 16).[2]  The request was denied.

In September 1999, LeFebvre received a certificate for completing the 13-week IVT course.  In October 1999, he met with Gingrich, her supervisor John Rynne, and Oz Mondejar, an Employee Development Specialist.  During the meeting, Gingrich expressed concern about LeFebvre's job performance thus far. LeFebvre, in turn, sought to address problems with the IVT training, and again asked that he be re-trained in a live classroom setting.  Although his request for another full training course was denied, LeFebvre was assigned to a one-week refresher course.

On November 17, 1999, Gingrich sent LeFebvre a memorandum citing continued concerns about his job performance.  LeFebvre contends that this memorandum was simply the documentation of a 90-day plan of assistance discussed during his meeting with Gingrich, Rynne and Mondejar in October.  Items of concern in the memo included how LeFebvre was conducting interviews and how he was developing claims.  Specifically, the memo identified 10 areas for improvement, and pledged continued feedback from LeFebvre's mentor, a job coach, and from

---

[2]  LeFebvre does recall having talked about the big screen as possibly being a problem for his seizure activity. (LeFebvre Dep. at 143, Paper 117-4 at 8).

Gingrich herself.  The memo also established specific performance benchmarks, each with a target date.  "[R]efresher training will be provided on a flow basis as needs are identified."  (Paper 117-13 at 6-9).

On February 1, 2000, Gingrich sent LeFebvre a memo in which she again expressed concerns about his performance.  In its conclusion, the memo stated that "you have not shown the progress I expected over the last two months, despite significant mentoring and additional training."  (Paper 117-14 at 6).  On February 22, 2000, Gingrich sent LeFebvre a third memo.  The introductory paragraph of the memo read as follows:

> We are meeting today because you have completed the 90-day review period.  We established specific benchmarks for you to attain by the conclusion of this time.  You received additional training both on and offsite during this time as well as extensive mentoring from Sid Harmon and Bob Willis.  We discussed your work frequently and I observed your interviews.  Based upon my observations of your interviews and your completed claims, you have not met those goals.

(Paper 117-15 at 6).  The memo concluded: "I do not consider that your job performance is at a successful level."  Id. at 7.

Three days later, on February 25, 2000, LeFebvre submitted a written response to this latest Gingrich memo.  In his response, LeFebvre opined that Gingrich's evaluation was "unusable without first establishing if the 90 day plan was adhered to on the part of training staff and administration.

I know that I can not [sic] be faulted for not **constantly trying** to achieve." (Paper 117-16 at 6) (emphasis in original). LeFebvre also reported having been asked if leaving the SSA might be "the best thing for me. I can not [sic] quit this position. Management needs to come up with an answer on how to best use my talents, provide successful training or terminate with cause." Id.

That same day, LeFebvre initiated the EEO process, and Gingrich subsequently informed him that he was being terminated effective March 10, 2000. In a report to the EEO counselor, LeFebvre identified himself as having epilepsy, and as suffering "issues of retention and processing speed brought on by the epilepsy or the side effects of medication I take for epilepsy." (Paper 117-18 at 9). He reiterated his concerns about the IVT program, and the fact that his in-person training at times contradicted the IVT instruction. "Despite my solid effort, the training program provided by Social Security with all its inconsistencies in text and instruction, lack of direction and field office support, left me confused and insecure." Id. LeFebvre also explained that the IVT program was not a good fit with his epilepsy. "The major accommodation a person with epilepsy needs, is a training program that is sequential, consistent, visual, concrete and hands on . . . . My sitting in front of a big

screen TV as a one student class was not good for epilepsy (some petit mal seizures in front of TV) and not good for learning (nobody to bounce questions off as they arose)."  Id.

With respect to the 90-day plan of assistance, LeFebvre claimed that the plan was not carried out.  "Weekly updates with Susan [Gingrich] happened once.  Reviewing basic training on a flow basis was not present." Id. at 10.  For relief, LeFebvre sought "a fresh start in a quality training program in order to sort out all the contradictions, inconsistencies and confusion's [sic] put into place by the single student IVT training class . . . ."  Id.

On April 4, 2000, LeFebvre filed a formal complaint of discrimination with the EEOC.  The complaint alleged that he was terminated "based upon my physical handicap (Epilepsy) and mental disability (learning disability)," and that the primary factor leading to his firing was inadequate training.  (Paper 117-9 at 6).  For relief, LeFebvre again requested a "traditional" training program, placement in Montpelier instead of Burlington, and back pay.  Id. at 8.  LeFebvre's EEOC discrimination claim was denied.

Discussion

I.  Summary Judgment Standard

Summary judgment should be granted only when there is no genuine issue of fact and the moving party is entitled to

10

judgment as a matter of law.  See Fed. R. Civ. P. 56(c);
Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The
moving party has the initial burden of demonstrating that
there is no genuine issue of material fact.  See Marvel
Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002);
Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18
(2d Cir. 1995) (stating that movant may meet burden by
"point[ing] to an absence of evidence to support an essential
element of the nonmoving party's claim.").  Once the movant
satisfies this burden, the non-moving party must respond by
setting forth "specific facts showing that there is a genuine
issue for trial."  Fed. R. Civ. P. 56(e).

        In determining whether summary judgment is appropriate, a
court must "construe the facts in the light most favorable to
the non-moving party and must resolve all ambiguities and draw
all reasonable inferences against the movant."  Williams v.
R.H. Donnelley, Corp., 368 F.3d 123, 126 (2d Cir. 2004).  "In
addition, pro se litigants must be given extra latitude,
particularly on a summary judgment motion."  Thomas v. New
York Dep't of Corr. Servs., 2006 WL 435718, at *4 (S.D.N.Y.
Feb. 23, 2006) (citing McPherson v. Coombe, 174 F.3d 276, 280
(2d Cir. 1999) (pro se pleadings should be read liberally and
interpreted "to raise the strongest arguments that they
suggest")).

II.  Legal Framework

Because LeFebvre was a federal employee, his claim of
discrimination is governed by § 501 of the Rehabilitation Act
of 1973.  See Rivera v. Heyman, 157 F.3d 101, 104-05 (2d Cir.
1988).  The Rehabilitation Act states that "[n]o otherwise
qualified individual with a disability . . . shall, solely by
reason of her or his disability, be excluded from the
participation in, be denied the benefits of, or be subjected
to discrimination under any program or activity receiving
Federal assistance."  29 U.S.C. § 794(a).  The standards for
determining whether an employer has discriminated under the
Rehabilitation Act are the same as those under the Americans
with Disabilities Act ("ADA").  29 U.S.C. § 794(d).

In analyzing a claim under the Rehabilitation Act, the
Court applies the burden-shifting analysis established by the
Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S.
792, 802 (1973).  See Reg'l Econ. Cmty. Action Program, Inc.
v. City of Middletown, 294 F.3d 35, 48 (2d Cir.), cert.
denied, 537 U.S. 813 (2002) (applying McDonnell Douglas to ADA
and Rehabilitation Act claims).  Under this analysis, the
plaintiff bears the initial burden of establishing a *prima
facie* case of discrimination.  Heilweil v. Mount Sinai Hosp.,
32 F.3d 718, 722 (2d Cir. 1994).  To establish a *prima facie*
case, LeFebvre must show that (1) he is disabled under the

12

Act; (2) he was otherwise qualified to perform his job, in that he could perform the essential functions of the job with or without reasonable accommodations; and (3) an adverse employment decision was taken against him based on his disability.  Heilweil, 32 F.3d at 722 (citing cases).

Once a *prima facie* case is established, the burden shifts to the employer to articulate a reason for the adverse employment decision.  Id.  If the employer articulates a legitimate, nondiscriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff to show that the stated reason is merely a pretext for discrimination.  Id.  At all times, the ultimate burden of persuasion remains with the plaintiff to show that the defendant intentionally discriminated.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

III.  Disability

In this case, the Commissioner first contests whether LeFebvre was disabled under the Rehabilitation Act.  LeFebvre responds that the Commissioner's argument is inconsistent with the fact that, at the outset, he was invited to participate in the Selective Placement Program precisely because he was disabled.  While LeFebvre's position has logical appeal, the question currently before the Court is framed solely by the definitions set forth in the Rehabilitation Act and related

13

regulations.  Those definitions, as discussed below, do not support his claim to an actionable disability.

Under the Rehabilitation Act, a "disabled individual" is one who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. § 705(20)(B).  To qualify as disabled under the Rehabilitation Act and the ADA, a plaintiff must show both that his physical or mental impairment limits a "major life activity" and that this limitation is "substantial."  42 U.S.C. § 12102(2)(A). Whether a disability exists must be determined on a "case-by-case" basis.  Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 198 (2002).

The Supreme Court has restricted "major life activities" to those activities "that are of central importance to daily life."  Toyota, 534 U.S. at 197.  Federal regulations provide a non-exhaustive list of what constitutes "major life activities" which includes "walking, seeing, hearing, . . . [and] performing manual tasks."  Id. at 195 (quoting 45 C.F.R § 84.3(j)(2)(ii) (2001)).  Similarly, EEOC regulations interpreting the term define it as including "functions such as caring for oneself, performing manual tasks, walking,

14

seeing, hearing, speaking, breathing, learning, and working."
29 C.F.R. § 1630.2(I) (2006).

When LeFebvre was being considered for a position with
the SSA, his documented disability was epilepsy.  Epilepsy
itself constitutes a physical or mental impairment.  <u>See</u> 29
C.F.R. § 1615.103(1)(ii) (2006); <u>Sutton v. United Air Lines,
Inc.</u>, 527 U.S. 471, 488 (1999).  Whether a person's epilepsy
substantially limits a major life activity, however, requires
further inquiry.  <u>See</u> <u>Russo v. Sysco Food Servs. of Albany,
LLC</u>, 488 F. Supp. 2d 228, 234 (N.D.N.Y. 2007).  The
documentation presented to the SSA by the Vermont Division of
Vocational Rehabilitation certified LeFebvre had not had a
grand mal seizure in years, and that his petit mal seizures
generally only occurred during waking moments at home.  The
documentation also stated that while he should not operate
heavy machinery, LeFebvre had the ability to work as a Claims
Representative without accommodations.  Accordingly, the
record does not support a finding of a substantial impairment
on the basis of LeFebvre's seizures.[3]

---

[3]   In one of his more recent memoranda, LeFebvre argues
that "sporadic" episodes brought on by his epilepsy have
impaired his ability to interact with others.  (Paper 132).
Courts have generally held that sporadic or occasional
episodes do not constitute a substantial limitation.  <u>See</u>,
<u>e.g.</u>, <u>EEOC v. Sara Lee Corp.</u>, 237 F.3d 349, 352 (4th Cir.
2001) (occasional seizures due to epilepsy did not
substantially limit plaintiff); <u>Herschaft v. New York Bd. of
Elections</u>, 2001 WL 940923, at *4 (E.D.N.Y. Aug. 13, 2001);

LeFebvre's primary claim is that his epilepsy hinders the major life activity of learning.  (LeFebvre Dep. at 107, Paper 117-4 at 3).  In addition to alleging a learning disability, a plaintiff must offer "'proof as to how this ability to learn compares with that of the average person.'"  See Montgomery v. Chertoff, 2007 WL 1233551, at *7 (E.D.N.Y. Apr. 25, 2007) (quoting DeMar v. Car-Freshner Corp., 49 F. Supp. 2d 84, 91 (N.D.N.Y. 1999)).  In this case, the testing performed on LeFebvre revealed little, if any, cognitive impairment when compared to the norm.  At deposition, LeFebvre's treating physician summarized the test results as showing "overall intact cognitive functions in the context of average intellectual ability."  (Paper 128, Ex. 2 at 45-46).  Furthermore, there is no evidence that any testing or diagnosis has ever identified LeFebvre as having a learning disability.

LeFebvre nonetheless maintains that he is learning disabled.  In support of his claim, he cites Gingrich's comment that despite LeFebvre's "best efforts," he was not able to successfully perform the job.  He also notes findings by a medical consultant, apparently made in conjunction with a claim for disability benefits, that he has had problems with

---

Horwitz v. L & JG Stickley, Inc., 122 F. Supp. 2d 350, 355 (N.D.N.Y. 2000).

understanding and memory.  (Paper 121-12 at 3).  Further, Dr.
Primeau has stated in response to written questions from
LeFebvre that epilepsy medication might affect memory.  (Paper
120-8).  Finally, LeFebvre submits a statement from his wife
in which she explains that his memory of unfamiliar things is
poor, and that he does not seem to learn as quickly as he did
when he took fewer medications.  (Paper 120-14).

The Supreme Court has held that "[i]t is insufficient for
individuals attempting to prove disability status . . . to
merely submit evidence of a medical diagnosis [or other
evidence] of an impairment."  Toyota, 534 U.S. at 198.
Instead, the plaintiff must offer evidence "'that the extent
of their own experience is . . . substantial.'"  Id. (quoting
Albertson's, Inc. v. Kirkinburg, 527 U.S. 555, 567 (1999)).
LeFebvre's evidence suggests that he has had increasing
problems with memory and understanding.  He has not offered
any evidence comparing his learning abilities to those of the
general population, and the analytical data that was presented
to his employer suggested that his cognitive functions
compared favorably.[4]  Consequently, there is insufficient
evidence upon which a jury could conclude that the impact of

---

[4]   LeFebvre submits that a learning disability is
different from an intellectual disability.  Even if the Court
accepts this assertion, LeFebvre's evidence of a learning
disability is insufficient.

LeFebvre's learning issues are so substantial as to constitute a disability under the Rehabilitation Act.

IV.   <u>Regarded as Disabled</u>

A disability can also be proved by demonstrating that the plaintiff is "regarded as" having an impairment that substantially limits one or more major life activities.  42 U.S.C. § 12102(2)(C).  In determining whether an individual is "regarded as" having a disability, the focus is "'on the employer's perception of the employee' and is therefore 'a question of intent, not whether the employee has a disability.'"  <u>Colwell v. Suffolk County Police Dep't</u>, 158 F.3d 635, 646 (2d Cir. 1998) (quoting <u>Francis v. City of Meriden</u>, 129 F.3d 281, 285-86 (2d Cir. 1997)).  Although LeFebvre contends that his hiring into the SPP alone means that he was regarded as disabled, he must nonetheless prove that the SSA regarded him as disabled within the meaning of the Rehabilitation Act.  <u>Id.</u>

Keeping these parameters in mind, there is nothing in the record to support a claim that the SSA regarded LeFebvre as disabled.  Given the documentation provided to the SSA at the outset, there is no indication that the defendant believed LeFebvre's epilepsy impaired a major life activity.  Nor is there sufficient evidence to show that the SSA saw LeFebvre's alleged learning disability as a substantial impediment in his

life.  In fact, as the defendant notes in his summary judgment filings, LeFebvre's deposition testimony faulted the SSA for *not* taking into account his learning issues.[5]  His "regarded as" claim therefore fails as a matter of law.

## V.  Otherwise Qualified

Even if, for the sake of argument, the Court were to find that LeFebvre was disabled, the record does not support his claim that he could have performed his job with or without reasonable accommodations.  Under the Rehabilitation Act, an employer must make reasonable accommodations unless those accommodations would impose an undue hardship.  Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 86 (2d Cir. 2004). The Second Circuit has defined "reasonable accommodation" as "one that gives the otherwise qualified plaintiff with disabilities 'meaningful access' to the program or services sought."  Henrietta D. v. Giuliani, 331 F.3d 261, 282 (2d Cir. 2003) (quoting Alexander v. Choate, 469 U.S. 287, 301 (1985)). An employer is not required "to provide every accommodation the disabled [person] may request, so long as the accommodation provided is reasonable."  Fink v. New York City Dep't of Personnel, 53 F.3d 565, 567 (2d Cir. 1995).

---

[5]  When asked at deposition whether he believed Gingrich "thought you were a slow learner because of your epilepsy," LeFebvre replied: "I don't think she factored that in." (LeFebvre Dep. at 196, Paper 117-4 at 23).

LeFebvre's claim here is that, given adequate training, he could have performed his job without any accommodations. However, he has failed to show that more classroom training would have been an effective accommodation.  See Jackan v. New York Dep't of Labor, 205 F.3d 562, 566-67 (2d Cir. 2000) (plaintiff must show that effective accommodation exists); Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 137-38 (2d Cir. 1995) (plaintiff bears burden of showing that an accommodation exists that permits [him] to perform job's essential functions).  Indeed, he was provided a refresher classroom course in December 1999, as well as extra one-on-one mentoring, but still failed to perform adequately.  There is no indication that additional efforts would have led to a different result.

Furthermore, LeFebvre did not consistently link his request for classroom training to a disability.  His supervisors do not recall him requesting classroom instruction due to his epilepsy, and LeFebvre himself cannot recall whether he ever stated that his request for a different type of training was due to his epilepsy.  (Gingrich Dep. at 91-92, Paper 128-6 at 3-4); (Rynne Dep. at 121-22, Paper 128-5 at 3-4); (LeFebvre Dep. at 153, Paper 117-4 at 16).

The undisputed facts show that at the time of his employment at the SSA, LeFebvre's epilepsy was not expected to

interfere with his ability to work as a Claims Representative. His intellectual capacity was measured to be, at worst, in the average range.  Consequently, even if the Court views the facts in a light most favorable to the plaintiff, LeFebvre's supervisors had little reason to believe that an epilepsy-related learning disability was the cause of his problems.

LeFebvre argues that the SSA should have been proactive in identifying accommodations, and that his supervisors should have engaged in the "interactive process" envisioned by federal disability laws.  29 C.F.R. § 1630.2(o)(3).  However, the initial burden is on the employee to notify the employer that an accommodation for a disability is needed.  29 C.F.R. pt. 1630 App. § 1630.9.  The purpose behind requiring the employee to initiate the process is "to protect an employer from a claim of discrimination by an employee whom it did not know to be hampered by a disability."  <u>Brady v. Wal-Mart Stores, Inc.</u>, 455 F. Supp. 2d 157, 174 (E.D.N.Y. 2006).[6]

---

[6]    LeFebvre alleges that, during the course of his employment at the SSA, he was not made aware of his rights under the relevant disability laws.  Specifically, he submits that the SPP required that employees be made aware of their rights, and that the SSA had no SPP coordinator to ensure that the employees fully understood those rights.  (Paper 120 at 2, 7).  While the government may have fallen short in this regard, its failure does not factor into the question of whether LeFebvre's supervisors acted in a discriminatory manner either during his training or at the time of his termination.

Here, the employer knew that LeFebvre had epilepsy.  This does not mean that the employer had notice of a learning disability, or that this disability would require a different learning environment.  In fact, the record indicates that LeFebvre did not link his request for live training to his learning disability.  For a trier of fact to find the defendant liable for failing to provide an accommodation under these facts would be unreasonable and unfair.  The Court therefore concludes, based upon the factual record, that LeFebvre's reasonable accommodation claim fails as a matter of law.[7]

## VI.    Discriminatory Intent

On the element of discriminatory intent, "direct evidence is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." Messer v. Bd. of Educ. of City of New York, 2007 WL 136027, at *9 (E.D.N.Y. Jan. 16, 2007) (citing Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Although inquiries into discriminatory intent and state of mind are often fact-intensive and fact-specific, summary

---

[7]    LeFebvre also contends, in response to the Commissioner's summary judgment motion, that "in retrospect" his request for reassignment in February 2000 was a reasonable accommodation request.  However, he has not carried his burden of showing that suitable vacancy existed.  Jackan, 205 F.3d at 567.

judgment may still be appropriate in a discrimination case where no material facts are in dispute.  See Abdu-Brisson v. Delta Air Lines, Inc., 238 F.3d 456, 466 (2d Cir. 2001).

LeFebvre cannot defeat summary judgment by relying "simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the adverse party's pleading." Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).  Instead, he must "proffer[ ] admissible evidence show[ing] circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory motive."  Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994).  Courts must "carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999), cert. denied, 530 U.S. 1242 (2000).

The defendant argues that LeFebvre has failed to show that he was treated differently from other, similarly situated employees.  See, e.g., Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 63 (2d Cir. 1997).  LeFebvre's evidence on this point is indeed weak. He admitted at his deposition that he was not singled out for IVT because of his disability, and the

documents in the record show that IVT was used as a training vehicle for scores of employees across the country.  He also does not know how his performance compared with that of other new hires who received IVT training.  (LeFebvre Dep. at 274, Paper 117-4 at 34).  Similarly, he complains that his plan of assistance was not carried out, but admits that he has no knowledge of whether plans of assistance for other employees were "just written up and never followed."  (LeFebvre Dep. at 186, Paper 117-4 at 22).

The Second Circuit has determined that disparate treatment is only one way of showing discriminatory intent. An inference of discrimination may also be shown by:

> the employer's continuing after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

Chambers, 43 F.3d at 37 (internal citations omitted); see Abdu-Brisson, 239 F.3d at 468.  Few, if any, of these scenarios apply to this case.  There is no evidence in the record detailing the SSA's efforts to fill LeFebvre's position with persons of his qualifications after he left.  Nor is there any evidence of criticism or invidious comments referencing a disability.  And as discussed above, LeFebvre

24

has not shown that other employees were treated more favorably.

As to the last example from the <u>Chambers</u> decision, LeFebvre may be able to argue, based upon the summary judgment record, that the sequence of events leading up to his termination is sufficient for an inference of discrimination. However, even when those events are viewed in a light most favorable to LeFebvre, it is difficult to detect any activity that was based upon a discriminatory motive.  LeFebvre was hired as part of a special program to employ persons with disabilities.  He was given a new, yet standardized training program.  When problems with his job performance arose, the SSA worked with him for a period of several months to try to bring his performance to an acceptable level.

The decision to terminate his employment was made by the same people who were involved in his hiring.  In such a case, where the same actor does the hiring and the firing, the Second Circuit has stated that invidious discrimination is "unlikely."  <u>Grady v. Affiliated Cent., Inc.</u>, 130 F.3d 553, 560 (2d Cir. 1997).  "[W]hen the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.  This is

especially so when the firing has occurred only a short time after the hiring." Id.

Moreover, as discussed above, it is not clear from the record whether supervisors even knew that the issues they were dealing with were the result of a disability.  LeFebvre had criticized his training program for inconsistencies and other shortfalls, but did not make clear at the outset that the program was a problem for him due to a disability.  In fact, he faults his supervisors for *not* attributing his learning issues to a disability.  (LeFebvre Dep. at 196, Paper 117-4 at 23).

A fundamental part of LeFebvre's argument is his charge that the IVT training was flawed, yet his job performance was compared with that of Claims Representatives who received traditional classroom training.  "[I]f my performance was to be compared to those people who got the better training, the training that I could better benefit from, then I was unfairly evaluated.  I was never really ever evaluated.  I was unfairly judged." (LeFebvre Dep. at 150, Paper 117-4 at 13).  LeFebvre concedes that he was not singled out for IVT because of his disability.[8]

_____

[8]  At most, LeFebvre has offered speculation about "the possibility . . . that [the SSA] did not want a person with seizure activity in the classroom." (Lefebvre Dep. at 151, Paper 117-4 at 14).

LeFebvre's criticisms of the IVT program may be fully justified.  His criticisms of subsequent efforts by the SSA to supplement his training and provide additional assistance may also be valid.  Nonetheless, the issue in this case is whether there was discrimination based upon a disability.  Even if the Court accepts the assertion the IVT program and LeFebvre's training in general was inadequate, this finding does not lend support to a theory of discrimination.

In short, the record on the issue of discrimination falls short of presenting any triable issues.  The defendant is therefore entitled to judgment as a matter of law.

VII.  Non-discriminatory Reason

If LeFebvre were able to establish a *prima facie* case of discrimination, "the *prima facie* case is not the end of the story."  Abdu-Brisson, 239 F.3d at 468.  "If a plaintiff successfully presents a *prima facie* case, the employer may rebut it by articulating legitimate and non-discriminatory reasons for the adverse employment action.  Id.  An employer has satisfied this burden if he offers reasons that, "taken as true, would permit the conclusion that there was a non-discriminatory reason for the adverse action."  Hicks, 509 U.S. at 509.

The defendant submits that LeFebvre was terminated due to poor job performance.  LeFebvre does not dispute that he had

problems with job performance, despite his best efforts.  The issue was raised early on in his employment, and continued to the date of his termination.  In the course of discussions about LeFebvre's job performance, there is no evidence of discussions relating to a disability, or to any other actionable ground for wrongful termination.  Accepting the defendant's reason for termination as true, the Court concludes at this stage in the analysis that there was a non-discriminatory reason for LeFebvre's termination.

VIII.   <u>Pretext</u>

Because poor job performance is a legitimate basis for firing an employee, the burden moves back to the plaintiff "to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory."  <u>Abdu-Brisson</u>, 239 F.3d at 469 (citing <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 510-11).  In his deposition, LeFebvre suggested that the SSA would not want to employ him because "it would open the door for a number of people of epilepsy, with epilepsy being eligible for this program."  (LeFebvre Dep. at 179, Paper 117-4 at 21).  This suggestion, while perhaps plausible, amounts to no more than speculation, and does not establish a material fact that would preclude summary judgment.  Therefore, even if LeFebvre had met his burden of showing a

28

*prima facie* case of disability discrimination, he has not produced sufficient evidence to support a rational finding that the defendant's reason for terminating him was false.

The defendant notes that when LeFebvre himself presented a claim for disability insurance benefits, he wrote that the reason for his termination was that his employer was not satisfied with his work.  To be fair, this statement may simply have been a restatement of the employer's words, and not a reflection of LeFebvre's belief that he was discriminated against.  Nonetheless, the Court finds that LeFebvre has failed to show that the employer's stated reason was a pretext for discrimination.

The SSA hired LeFebvre in part *because* he was disabled. The defendant accepted that LeFebvre's epilepsy would not prevent him from working, and that neurological testing found his mental functioning to range from average to above average. LeFebvre was given standard training and, when problems arose, was provided additional assistance.  Problems were identified in writing early on, and an action plan was developed.  While there is a dispute about whether that plan was fully carried out, there is no evidence in the record suggesting that failures by SSA supervisors were motivated by discriminatory intent.

In the end, LeFebvre was terminated for poor job performance.  The Court accepts his assertion that he gave a complete effort, and does not doubt either his work ethic or his desire to succeed.  The SSA found that LeFebvre's skills were not adequate for the job, and terminated his employment. Absent a presentation of material facts to show that the employer's reason was pretextual, this case will not proceed to a jury.  The defendant's motion for summary judgment is therefore GRANTED.[9]

<u>Conclusion</u>

For the reasons set forth above, the defendant's motion for permission to respond to LeFebvre's last filing (Paper 133) is GRANTED, the defendant's motion for summary judgment (Paper 116) is GRANTED, and this case is DISMISSED.

Dated at Brattleboro, in the District of Vermont, this 28th day of February, 2008.


<u>/s/ J. Garvan Murtha            </u>
J. Garvan Murtha
United States District Judge

---

[9]  Because the Court is granting summary judgment on the merits, it does not reach the defendant's argument that LeFebvre's reasonable accommodation claim is time-barred.